## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|                                        |     |                               |
|----------------------------------------|-----|-------------------------------|
| UNITED STATES OF AMERICA               | )   |                               |
|                                        | )   |                               |
| v.                                     | )   | Criminal No. 1:08cr461 (LMB)  |
|                                        | )   |                               |
| MICHAEL MITRY HADEED, JR.,             | )   |                               |
|                                        | )   |                               |
| Defendant.                             | )   |                               |

### SENTENCING MEMORANDUM OF MICHAEL MITRY HADEED, JR.

Defendant, Michael Mitry Hadeed, Jr. ("Mr. Hadeed"), submits this Sentencing Memorandum, and the attached exhibits, for the Court's consideration in advance of his sentencing on May 29, 2009. In accordance with the factors enumerated in 18 U.S.C. § 3553(a), and for the reasons set forth below, Mr. Hadeed requests that the Court recognize that a sentence of probation is "sufficient, but not greater than necessary" in this case.

Mr. Hadeed has filed a post-trial motion for acquittal or for a new trial. That motion is fully briefed and was argued on April 24, 2009. After oral argument, the Court took the motion under advisement, and a ruling on the motion is still pending. Nothing in this memorandum should be construed as a waiver of any portion of Mr. Hadeed's post-trial motion.

### ARGUMENT

## I.     BACKGROUND

The Government charged Mr. Hadeed with 62 overt acts in furtherance of an immigration fraud conspiracy that was alleged to stretch back to 1999. Only 12 of these 62 overt acts were alleged to have occurred within the five-year statute of limitations. The alleged conspiracies

with each of the five aliens named in the Indictment began between 1999 (Mr. Arbid) and 2003 (Mr. Freifer).

Of the 12 overt acts that were alleged to occur within the statute of limitations, the Government failed completely to support the two central overt acts asserted in connection with the substantive immigration fraud counts – *i.e.*, possession of an Employment Authorization Document that was procured by fraud or otherwise unlawfully obtained. Based on this utter failure of proof concerning the most central element of two of the alleged crimes in the Indictment, the Court granted Mr. Hadeed's Rule 29 Motion with respect to those two substantive counts at the close of the Government's case-in-chief.[1]

That left just 10 of the 62 overt acts remaining for consideration by the jury. Of those remaining overt acts, seven (7) related to the dismissed substantive immigration fraud counts concerning Mr. Alakwa and Ms. Pagoaga, and three (3) overt acts related to Mr. Freifer. On February 13, 2009, after a week-long trial, Mr. Hadeed was convicted of conspiracy, in violation of 18 U.S.C. § 371 (Count One), and of aiding and abetting a false statement with regard to Mr. Freifer's application, in violation of 18 U.S.C. § 1001 (Count Two).

Even though the Government was able to introduce a substantial amount of evidence relating to time-barred conduct, none of this aged evidence was particularly high in quality. Mr.

---

[1]    The Government knew before trial that it would be unable to obtain the testimony of Mr. Alakwa and that it had no other witness who could establish that he possessed an Employment Authorization Document during the alleged time period. The Government also should have known that it did not even have a copy of Mr. Alakwa's alleged Employment Authorization Document. In light of that knowledge, the Government should have dismissed the immigration fraud count concerning Mr. Alakwa prior to trial rather than use it unfairly to the prejudice of Mr. Hadeed. The same is true for the immigration fraud count concerning Ms. Pagoaga. The Government never introduced her alleged Employment Authorization Document into evidence, nor did it attempt to solicit testimony from her that she possessed the alleged document. (Indeed, the only Employment Authorization Document for Ms. Pagoaga in evidence was one she obtained by virtue of her temporary protected status as a Honduran.) In short, either Mr. Hadeed should never have been indicted on immigration fraud charges, or the Government should have dismissed those charges prior to trial. Because neither charge ever should have been part of this case, neither should be part of sentencing.

Freifer's story, in particular, was extremely suspect.  First, he admitted that his relationship with Mr. Hadeed started with a lie (specifically, that Mr. Tahan told Mr. Hadeed that Messrs. Tahan and Freifer were relatives).  No one ever explained why a lie would have been necessary, given the contention that Mr. Hadeed had been conspiring with Mr. Tahan since 1999.  Second, everything that Mr. Freifer said to or heard from Mr. Hadeed was translated by Mr. Tahan, who has to be among the least credible witnesses ever to testify in this Court.  Third, it is undisputed that the scheme between Mr. Tahan and Mr. Freifer *continued two years after Mr. Tahan was convicted and started cooperating with the Government, and, even more crucially, two years after Mr. Hadeed had dropped Mr. Freifer as a client* (and, in fact, had withdrawn from all cases involving Tony Tahan and the King of Pita Bakery).  Indeed, in 2006 and 2007, Mr. Freifer told the same story (that he was an experienced baker who had worked at the Al Najah Bakery in Beirut), with the same U.S. sponsor (Mr. Tahan and the King of Pita Bakery), but using *an entirely different attorney* (Orlando Gamarra, instead of Mr. Hadeed).  He admitted during trial that he continued to tell this story well into 2007, to a consular officer in Beirut.

The lead witness against Mr. Hadeed was Tony Tahan.  He could not remember the sentence he received for immigration fraud, appeared lethargic, and was impeached in so many ways and on so many issues that it is difficult to say whether anything he said is true.  A consistent theme, however, throughout both his testimony and that of Jean-Claude Sakr, was that they both, along with Marouf Arbid, were involved in unusual and abusive sexual relationships with Mr. Tahan.  Mr. Tahan also admitted at trial that he fabricated prior employment letters for Mr. Arbid and Mr. Sakr, and that he alone did all of the translating for Messrs. Arbid, Sakr, and Freifer when it came to interfacing with Mr. Hadeed.

The Government did not even put Mr. Arbid (who, to this day, continues to work at the King of Pita Bakery – a mere two miles from the courthouse) on the stand.  So, all of the testimony in this case concerning his role in the conspiracy came from the demonstrably unreliable Mr. Tahan.  Similarly, another alleged conspirator, Ibrahim Alakwa, a Yemini national with no known connections to any of the other alleged King of Pita alien conspirators, never testified.

The evidence showed that Mr. Hadeed realized little, if any, financial benefit from his dealings with Mr. Tahan.  When Mr. Hadeed dropped Mr. Tahan as a client, Mr. Hadeed wrote off more than $40,000 in unpaid fees.  The evidence also showed (and the probation officer has concurred (PSR at ¶ 32)) that the alleged scheme resulted in no harm to anyone.

Moreover, the uncontroverted evidence in the case showed that, due to unique circumstances at the immigration service and in the Northern Virginia economy at the time, all of the aliens involved in the alleged conspiracy would have been entitled to green cards had they applied as unskilled workers simply on the basis of bona fide job offers from the King of Pita Bakery.[2]  Thus, no alien received an employment-based visa to which he or she otherwise would not have been entitled.  This is confirmed by the fact that the Government has not deported a single resident alien in this case, even though one of them was convicted of immigration fraud and another one pleaded guilty to immigration fraud back in 2003 and 2004.  Furthermore, the Government has never charged Ms. Pagoaga with any crime, even though she crossed the border

---

[2]    Despite the Government's suggestions to the contrary, three of the aliens (Ms. Pagoaga, Mr. Arbid and Mr. Sakr) worked at the King of Pita for years.  Mr. Arbid works there today, and Mr. Sakr worked there as recently as December, 2008.  Ms. Pagoaga worked at the Bakery for nearly a decade, from 1996 until 2005.  For his part, Mr. Freifer testified that he would have worked there had he been granted a green card.  The testimony was that Mr. Alakwa, the fifth alien, worked at the Bakery at least for a while before returning to Yemen.

illegally in 1996 and worked illegally at King of Pita for years using a fake social security number.

## II.    APPLICATION OF SENTENCING FACTORS

The Supreme Court has dramatically changed the landscape of federal sentencing in recent years. In *United States v. Booker*, 543 U.S. 220 (2005), and its subsequent opinions in *Gall v. United States*, 128 S. Ct. 586 (2007) and *Kimbrough v. United States*, 128 S. Ct. 558 (2007), the Supreme Court rendered the Sentencing Guidelines ("Guidelines") "advisory," and but one factor for judges to consider in fashioning a sentence. In ensuring that every defendant is afforded "an individualized assessment based on the facts presented," *Gall,* 128 S. Ct. at 596-97, a court may properly deviate from the Guidelines range "to tailor the sentence in light of other statutory concerns." *Kimbrough*, 128 S. Ct. at 570 (quoting *Booker*, 543 U.S. at 245-46).

These "other statutory concerns" are set forth in 18 U.S.C. § 3553(a), which prescribes the following factors for a Court to assess during sentencing:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)  to afford adequate deterrence to criminal conduct;

(C)  to protect the public from further crimes of the defendant; and

(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

(3)    the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established
        for—

        (A)  [in the Sentencing Guidelines] . . .

(5)     any pertinent policy statement—

        (A)  issued by the Sentencing Commission . . .

(6)     the need to avoid unwarranted sentence disparities among
        defendants with similar records who have been found guilty
        of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (2006).

        The guiding principle, as set out in the parsimony clause of § 3553(a), is that the Court

impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals of

sentencing.  Thus, rather than presuming that the Guidelines-calculated sentence meets this

standard, the Court must consider all of the § 3553(a) factors.  *Gall*, 128 S. Ct. at 596-97; *see

also United States v. Biheri,* 356 F. Supp. 2d 589, 594 (E.D. Va. 2005) ("fashioning a just

sentence cannot be reduced to a mere arithmetical exercise . . . sentencing, in the end, must

involve the exercise of *judgment, i.e.,* a judge's discerning opinion that results from identifying

and weighing fairly all of the factors relevant to achieving the statutory sentencing goals").

When the other § 3553(a) factors weigh in favor of a sentence other than what the Guidelines

prescribe, the Court may properly impose a non-Guidelines sentence.  *United States v. Benkahla*,

501 F. Supp. 2d 748, 758 (E.D. Va. 2007) (court may impose a "variance sentence" where the

Guidelines sentence does not serve § 3553(a) factors); *accord United States v. Pauley*, 511 F.3d

468 (4th Cir. 2007) (upholding sentence that departed 36 months from low end of Guidelines).

        As set forth below and in his letter to Probation Officer Lauder, Mr. Hadeed submits that

the proper Guidelines calculation for this offense, 6, yields a Guidelines range that encompasses

the appropriate sentence.  To the extent that the Court disagrees with this calculation, Mr.

Hadeed respectfully submits that, considering the other factors set forth in § 3553(a), a sentence

of probation satisfies the purposes of sentencing in this case.  In the event that the Court wishes

to impose conditions on the probation, Mr. Hadeed requests a term of community service and/or

a term of home detention, so that he can continue to work and support his wife and six children

while serving his sentence.  If the Court finds that a period of incarceration is required, Mr.

Hadeed requests that he be given a split sentence of incarceration and home detention.

**A.      The Need for the Sentence to Provide Just Punishment and Deterrence**

Before the Indictment in this case, Mr. Hadeed enjoyed a successful, growing law

practice and an overwhelmingly positive reputation in this community, where he has lived his

entire life.  This conviction has had a significant and irreversible impact on both of these

accomplishments.  As a result, Mr. Hadeed will be disbarred, or, at the very least, will lose his

license to practice law for a significant period of time.  This is professionally and economically

devastating to Mr. Hadeed and to his large family and his many employees.  Mr. Hadeed

recognizes, and deeply regrets, the collateral consequences that this conviction will have on his

firm's employees and clients, many of whom he has forged lasting relationships with over the

two decades he has practiced law.

Aside from the professional consequences of his conviction, Mr. Hadeed feels great

shame for the position in which he has placed his family.  The emotional strain on the entire

Hadeed family – his wife and six children, and his parents, siblings, and extended family – has

been severe.   Mr. Hadeed is greatly saddened by the negative impact that this Indictment and

conviction have had on his family's reputation in the community, one that his grandfather began

building when he came to the U.S. in 1905.  In addition to the emotional strain, he knows that

this conviction will have serious practical consequences for the daily lives of his immediate

- 8 -

family.  The Hadeeds currently have five children in school: one in elementary school, two in high school, and two in college (a son at the University of Virginia, and a daughter at Virginia Tech).   Mr. Hadeed's loss of license, whether temporary or permanent, means that his wife Marcella, who has cared for their children full-time for the past 20 years, will have to work outside of their home to support the family.

It is no understatement to say that Mr. Hadeed has been professionally, financially, and emotionally devastated by this ordeal.  Although he was not indicted until November 2008, the Government had been investigating him for years.  Since at least 2007, when the Government had his paralegal arrested, Mr. Hadeed has been living with the strain of being in the crosshairs of a Government investigation.  Although the Government recognized it had nothing with which to prosecute the paralegal and dropped the charges against her soon after her arrest, the investigation of Mr. Hadeed continued.  In the meantime, the paralegal's arrest caused the breakup of Mr. Hadeed's law firm.  The events of this investigation and the subsequent Indictment and trial have destroyed Mr. Hadeed professionally, and the costs of defending himself have depleted his finances and then some.

Mr. Hadeed will bear the stigma of a felony conviction, and the corresponding loss of his reputation in this community, for the rest of his life.  A term of probation, the loss of his license, the loss of a promising and lucrative career, and the personal and professional devastation of this Indictment, trial, and conviction surely satisfy the aims of punishment and deterrence in this case.

**B.      The Nature and Circumstances of the Offense**

Aiding or counseling a false statement is a serious crime.  But even in the scheme alleged by the Government, Mr. Hadeed's role was plainly secondary to that of Tony Tahan, the owner of the King of Pita Bakery.  As the evidence at trial showed, Tony Tahan had numerous,

intensely personal, motives for devising the immigration fraud scheme, and unique opportunity to control his employees and the information provided to Mr. Hadeed.  Furthermore, the uncontroverted evidence at trial showed that Tony Tahan continued his scheme – using the same lies, but a different lawyer – years after Mr. Hadeed withdrew from all matters involving Tony Tahan and the King of Pita Bakery, and after Mr. Tahan had pled guilty and had been sentenced for immigration fraud.

      C.      **Calculation Under the Advisory Sentencing Guidelines**

Undersigned counsel and Mr. Hadeed have reviewed the Presentence Report ("PSR") prepared by Probation Officer Joanne Lauder and her May 18, 2009 Addendum.  As stated in an April 30, 2009, letter to Ms. Lauder, counsel objects to Ms. Lauder's calculation of the offense under the Sentencing Guidelines.  Ms. Lauder's position, as detailed in her Addendum, is that Mr. Hadeed's offense level should be an eleven (11).  She reaches this number by calculating the offense level for the conspiracy count using the base offense level for immigration fraud, despite the fact that the special verdict in this case specifies that the conspiracy conviction was limited to a false statement.  Ms. Lauder based her decision on her belief that the facts of the case established, by a preponderance of the evidence, support for a conviction for conspiracy to commit immigration fraud.

The calculations set forth by the probation department in the PSR are not consistent with the Guidelines' instructions, the jury's verdict, or the facts of this case.  Mr. Hadeed was convicted of one count of conspiracy in violation of 18 U.S.C. § 371, and one count of making a material false statement, in violation of 18 U.S.C. § 1001.  An application of the relevant Guidelines in this case should result in an adjusted offense level of six (6).

The base offense for Count One, the conspiracy count, should be six (6).  As Guideline 2X1.1(a) states, the base offense for a conspiracy count should be "the substantive offense."  In

this case, the relevant substantive offense can <u>only</u> be a violation of 18 U.S.C. § 1001 (false statement) because:

(1)     the jury explicitly specified on the special verdict form that the conviction for conspiracy was based entirely and only upon the overt acts concerning the false statement relating to Mr. Freifer (see attached);

(2)     the only substantive count the jury found was a false statement (charged under 18 U.S.C. § 1001) relating to Charbel Freifer; and

(3)     the substantive immigration fraud counts (charged under 18 U.S.C. § 1546) in the case were dismissed based on a complete failure of proof as to their most essential element.

As specified in the special verdict, the jury's conviction on the conspiracy count rested solely upon the alleged false statement involving Mr. Freifer.  After receiving the Court's instruction to identify all of the overt acts it believed supported a conviction on Count One, the jury marked *only* those acts relating to Mr. Freifer.  Because the jury has already determined the object of the conspiracy, no further examination of the facts is appropriate.

Both the Guidelines and the Fourth Circuit specify that an examination of the facts of a case to determine the substantive offense to be considered for sentencing on a multi-object conspiracy count is *only* appropriate in the *absence* of a special verdict.  Guideline 1B1.2 covers this issue.  The Guidelines specify that, where a multi-object conspiracy is charged, an analysis of the facts to determine the "object of the conspiracy" is required in cases "in which the verdict . . . does not establish which offense(s) was the object of the conspiracy."  Guidelines 1B1.2 cmt. 4.  They further provide that "*[i]n such cases*," the Court should weigh the evidence to determine which objects would be appropriate for sentencing."  *Id.* (emphasis added).

The Fourth Circuit has also noted that the analysis of the facts of a case to determine which objects of a multi-object conspiracy are appropriate for sentencing is *only* required absent a special verdict.  *See United States v. Horton*, 1994 U.S. App. LEXIS 28218, at *4-*5 (4th Cir.

1994) (unpublished decision) ("*Because the jury did not return a special verdict*, particular care must be taken here to apply § 1B1.2(d) to the facts of the instant case.") (emphasis added) (attached as Exhibit A). In *Horton*, the Fourth Circuit also cited from the Sentencing Commission's Appendix on this point, noting that the Guidelines' instructions for a court to analyze the evidence "is provided to address cases in which the jury's verdict does not specify … which offenses were the object of the conspiracy of which the defendant was convicted…." *Id.* (quoting Guidelines Appx. C, Note 75). Because the jury's verdict in this case clearly specified the false statement conduct as the basis for its conviction, such an analysis is not appropriate, and the base offense level for false statements should be used on Count One.

Even absent the special verdict in this case, the facts at trial do not support a finding that Mr. Hadeed conspired to commit immigration fraud beyond a reasonable doubt, the standard that the Guidelines and the Fourth Circuit instruct must be used in this situation. The Guidelines explicitly provide that if the jury's verdict does not establish the object of the conspiracy, then the Court should *only* use the base level offense for the objects of the conspiracies that the Court, "were it sitting as a trier of fact, would convict the defendant of conspiring" to commit. Guidelines §1B1.2(d), cmt. 5. The Fourth Circuit confirmed that a district court must "find beyond a reasonable doubt that [a] defendant conspired to commit the object offense or offenses of the conspiracy charge" before using that object as a basis for selecting an offense level. *Horton*, 1994 U.S. App. LEXIS 28218 at *5-*6 (citing *United States v. McKinley*, 995 F.2d 1020, 1025-26 (11th Cir. 1993) and Guidelines Appx. C, Note 75). As a result, Ms. Lauder's conclusions concerning the base offense level for the conspiracy count should not be considered, as she grounded them in the preponderance of evidence standard. PSR Addendum at A-1, A-2.

There simply was not evidence beyond a reasonable doubt in this case to support a conviction of conspiracy to commit immigration fraud. The evidence in this case concerning Mr. Freifer is that he abandoned the form DS-230 he submitted while Mr. Hadeed was his attorney and that no visa, alien registration receipt card, or other document authorizing stay or employment in the United States was ever issued for Mr. Freifer. In fact, Mr. Freifer was not allowed to enter or work in the United States until he appeared to testify in this trial.[3] The Government recognized the limitations on this evidence, as it charged the conduct relating to Mr. Freifer under 18 U.S.C. § 1001, whereas it charged the other substantive counts in this case under 18 U.S.C. § 1546(a).

The evidence concerning the other alleged co-conspirators is also not sufficient. The Court dismissed the substantive immigration fraud charges concerning Mr. Alakwa and Ms. Pagoaga because of a complete lack of proof – and those charges should have been dismissed by the Government prior to trial for that very reason. Any evidence concerning Messrs. Sakr and Arbid was inherently unreliable because it concerned actions that occurred many years back and fell well outside of the statute of limitations, which is "the primary guarantee against bringing overly stale criminal charges," *United States v. Ewell*, 383 U.S. 116, 122 (1966), and which "specif[ies] a limit beyond which there is an irrebuttable presumption that a defendant's right to a fair trial would be prejudiced." *United States v. Marion*, 404 U.S. 307, 322 (1971). Further, Mr. Arbid never testified in this matter, leaving Mr. Tahan as the only support for the conduct concerning him. As described throughout this memorandum, the overwhelming majority of evidence in this case consists of testimony from impeached witnesses, who lack credibility and are admitted perjurers, and comes nowhere near the reasonable doubt standard.

---

[3]    In addition, the evidence established that Mr. Hadeed withdrew from representing Mr. Freifer and ceased all communication with him before any immigration documents could have been issued.

- 13 -

For the reasons stated above, once Count One is examined using the correct substantive offense, the analyses for Counts One and Two are the same.  Mr. Hadeed agrees with the findings set forth in the PSR regarding the analysis of Count Two, the false statements claim. The base offense level for a violation of 18 U.S.C. § 1001 is six (6), pursuant to §2B1.1(a)(2) of the Guidelines.  As stated in the PSR, no levels should be added in this matter.

The convictions on Counts One and Two should be considered one Group, as specified in Guidelines 3D1.1 and 3D1.2(c).  As discussed above, both Counts carry the same offense level. As a result, the final offense level for this Group is a six (6).  Because Mr. Hadeed has no criminal history, the resulting Guideline range is 0-6 months in "Zone A" of the Guidelines. Because his offense level falls with "Zone A," he would be eligible for probation.  Guidelines 5B1.1(a)(1).  If the Court disagrees, and accepts the Government's Guidelines calculation of 11, then Mr. Hadeed would be in "Zone C" and eligible for a split sentence.  Guidelines § 5C1.1(d).[4]

### D.    The History and Characteristics of the Defendant

Mr. Hadeed is a 50-year-old D.C. area native who has lived here all of his life (save four years when he attended college at Virginia Tech).  He is a devoted husband and father to his wife, Marcella, and their six children; a devoted lawyer to the clients he has represented in this area for the past 23 years; and an actively involved member of this community for decades.

When he graduated from Virginia Tech in 1980, Mr. Hadeed had the option to join his family's local business, Hadeed Carpet & Rug, which his father had started in 1955 and which had grown into a well-known and regarded establishment in the community.  Instead of joining the family business, however, Mr. Hadeed chose to make his own career.  He enrolled in law

---

[4]    Because the Guidelines are merely advisory, the Court has the power to impose a sentence of probation or probation with home detention even if it finds that the appropriate Guidelines calculation is an 11.

school at George Mason University, taking classes at night and helping out at Hadeed Carpet during the day.

It was in law school that Mr. Hadeed met his wife, Marcella.  Upon graduation, the two were married, and Mr. Hadeed began his own law practice on Mount Vernon Avenue, in the Del Ray section of Alexandria.  From the outset, Mr. Hadeed handled a variety of civil and criminal matters for individuals and for small, family businesses.  As a young lawyer, he also volunteered to serve as a CJA attorney, and eventually became one of a small group of CJA attorneys who was frequently called upon by the court.  Dennis Kennedy, a prosecutor in this district during those years, often found himself across the table from Mr. Hadeed.  He recalls that Mr. Hadeed "was never one to run the meter," instead always trying "to find a positive solution for all parties and victims under all scenarios."  Mr. Kennedy developed such a respect for Mr. Hadeed's "gentlemanly practice of law" that, over the years that followed, Mr. Kennedy referred numerous immigration clients to Mr. Hadeed, whom he knew would "fairly, knowledgably, and professionally" represent them.  (*See* Exhibit B, letter from Dennis Kennedy.)

As Mr. Hadeed's practice and reputation within the legal community grew, so did his family.  Between 1985 and 1997, the Hadeeds had six children, three girls and three boys.  Today, the Hadeed children range in age from 11 years (Tommy, a fifth-grader) to 23 years (John, who lives and works in New York).  In a letter to the Court, attached as Exhibit C, the couple's oldest son John recalls how his father worked long hours during his childhood, yet still found time to lead Cub Scout packs, coach sports teams, and otherwise engage in his children's lives.

Mr. Hadeed, who was the first in his family to attend college, has always stressed the importance of education to all of his children.  As John describes, "my parents have always put

our education first, working hard to ensure we received the best available." *See* Ex. C.  John

further explains that "our real education began at home – an education in values [and] faith that

formed the core of who each of us has become as individuals.  Distinctions between right and

wrong, just and unjust form my earliest memories, and continue to be lessons that each of the six

of us learn from our parents every day."  Mr. Hadeed's devotion to his children is a constant

theme of the letters attached to this memorandum, and perhaps most succinctly summed up by

Father Dennis Kleinmann, the pastor of the Hadeeds' parish, St. Mary's in Alexandria: "He,

along with his wife Marcella, has raised a wonderful family.  His good example and love for

their children show in all that he does.  It is also reflected in the fine young people his children

have become." (*See* Exhibit D, letter from Rev. Dennis Kleinmann.)  As Mr. Hadeed's wife

Marcella describes it, "We have a real partnership . . .We have survived this nightmare so far

because we have been together and have been able to keep the children's lives as normal as

possible . . . Mike's presence in the home is critical to their well being." (*See* Exhibit E, letter

from Marcella Hadeed.)

From the very beginning of his career, Mr. Hadeed has been an active part of the local

business community.  As a young lawyer, he joined the Alexandria Lions Club, a local civic

organization, and eventually became its president.  He then incorporated and was the founding

president of the Potomac West Business Association, an affiliate of the Alexandria Chamber of

Commerce.  From participating in the annual "Turkey Trot" foot race for the local food bank on

Thanksgiving morning, to representing the city of Alexandria on the Task Force for Potomac

Yards, Mr. Hadeed has donated his time and skill out of pride for his community.  Family friend

Howard Dixon, a longstanding member of the Lions Club, recalls that Mr. Hadeed, the youngest

member of the Club, took the initiative to start a foundation to honor a visually-impaired member

of the community.  As Mr. Dixon described, "With Michael's sage advice and assistance, he enabled the club to provide eyeglasses and hearing aids to many Alexandrians who have a financial need [,] and to donate to causes that the club supports such as sight and hearing research."  (*See* Exhibit F, letter from Howard Dixon.)

As the years went by, Mr. Hadeed began to focus his practice on immigration law and, over time, gained a reputation in the community for his competence in the field.  In the mid-1990s, he conducted the first of numerous Continuing Legal Education courses on immigration law for the local bar association.  More recently, in 2007, he was honored to receive an invitation from the Virginia State Bar to speak at the annual judicial conference, where he gave a lecture to general district court judges on the topic of immigration consequences of criminal convictions, an area in which he has had several victories in court in recent years.[5]  Additionally, he has enjoyed a good relationship with the local arms of government agencies that oversee immigration, and in fact has trained a number of junior attorneys and paralegals at his firm who have gone on to government service in the field.

Over the years, Mr. Hadeed has been a valued mentor to other lawyers and professionals in the community.  Greg Wade, a local private practitioner who has known Mr. Hadeed since the mid-1980s, sought out Mr. Hadeed's advice on practicing immigration law in the mid-1990s.  Mr. Wade recalls that Mr. Hadeed specifically counseled him on the ethical challenges facing immigration lawyers – and that Mr. Hadeed was "scrupulous and meticulous in his ethical standards . . . not once did he hint or suggest, expressly or by innuendo, that corners should be cut."  (*See* Exhibit I, letter from Gregory Wade.)

---

[5]    A copy of Mr. Hadeed's judicial conference presentation is attached as Exhibit G.   Between 2005 and 2008, Mr. Hadeed handled several successful post-conviction relief motions for clients who suffered adverse immigration consequences because of ineffective assistance from their former criminal defense lawyers. Copies of three of these opinions are attached as Exhibit H.

Kenneth Labowitz, another local practitioner, specifically recalls observing, as opposing counsel, the high ethical standards to which Mr. Hadeed held himself.  In a case where Mr. Hadeed had the opportunity to surreptitiously use a piece of evidence, Mr. Labowitz recalls that "Michael declined to do what was easy and expedient but questionable ethically.  Instead, he made clear to the court and to me as opposing counsel the source of the evidence in the most honorable manner, in keeping with my consistent experience with him as a lawyer and member of the community." (*See* Exhibit J, letter from Kenneth Labowitz.)

Tobias Naegele, a longtime friend of Mr. Hadeed's through their parish, St. Mary's Catholic Church, specifically recalls Mr. Hadeed voicing his opinion on ethical issues in the context of family obligations: "I remember specifically one conversation in Mike's dining room on a sunny New Year's Day in which the topic turned to paying for college.  Mike said he knew people who intentionally and artificially depressed their incomes in order to qualify for financial aid; he dismissed that behavior as dishonest. 'I wouldn't do that,' he said.  I believe Mike would never intentionally break the law." (*See* Exhibit K, letter from Tobias Naegele.)

Mr. Hadeed's former employees echo these sentiments.  Alix Mattingly, who worked for Mr. Hadeed as a junior attorney from 1998 to 1999, recalls that Mr. Hadeed "consistently conducted himself in an ethical manner and was careful to avoid even the appearance of impropriety, counseling me to carefully scrutinize cases for fraud."  In particular, Ms. Mattingly recalled one case where Mr. Hadeed encouraged a client to cooperate with the FBI in the investigation of the client's former attorney, who had falsified labor certification filings.  She remembers Mr. Hadeed's "outrage" at such illegal activity.  (*See* Exhibit L, letter from Alix Mattingly.)   Miguel Rivera, an associate at Mr. Hadeed's firm from 2003 to 2006, similarly recalls that Mr. Hadeed handled cases "with the utmost diligence, sensitivity and integrity."  He

- 18 -

notes Mr. Hadeed's equal dedication to all of his clients, noting that "Michael <u>never</u> compromised the quality of his representation or the investment of his time" when clients were unable to pay their bills.  (*See* Exhibit M, letter from Miguel Rivera.)

Mr. Hadeed is likewise revered by many of his current and former clients for his integrity, honesty, and approachability.  One client, Samiah Hamdan, recalls how Mr. Hadeed went in person to the immigration office to help an immigration officer search for Ms. Hamdan's file when it went missing, without charging her any additional fee.  (*See* Exhibit N, letter from Samiah Hamdan.)  Another client, Fahim Najafie, tells how he saw Mr. Hadeed reject a case when he learned that the potential client was lying to him: "Mr. Hadeed became very upset but in a civilized manner escorted [the individual] out of his office.  Mr. Hadeed informed [the individual] that he will not assist him under false pretenses and it's illegal to provide fraudulent documents and will not take his case.  Mr. Hadeed mentioned to him that all lawyers practice by law and those false statements are prohibited and can lead to criminal charges."  (*See* Exhibit O, letter from Fahim Najafie.)  Lena Rizkallah, who worked for Mr. Hadeed's firm from 1997 to 1998, similarly recalled "many instances in which he [Mr. Hadeed] turned down a case because he was uncomfortable with the facts and circumstances surrounding the case and didn't want to jeopardize his professional reputation."  (*See* Exhibit P, letter of Lena Rizkallah.)[6]

Despite his conviction, those who have known Mr. Hadeed professionally and socially over the years remain tremendously supportive.  His relationships with some of his clients have turned into genuine friendships.  For example, client Kingsley Amlalo recounts in a letter to the Court that Mr. Hadeed was a guest at his 60th birthday party, and that he invited Mr. Hadeed to

---

[6]    More than 50 other colleagues and clients of Mr. Hadeed, after learning about his conviction in this case, have taken the time to write letters to express their belief in him and their positive experiences with him.  These letters, too voluminous to excerpt in this memorandum, have been submitted to the Court under separate cover.

his daughter's wedding. (*See* Exhibit Q, letter from Kingsley T.K. Amlalo.) Aysheh Salem, a corporate client whom Mr. Hadeed has represented in numerous matters since 1997, states: "He greets you in your front waiting room by name and a smile and puts you at ease. He has no airs." (*See* Exhibit R, letter from Aysheh Salem.) In Mr. Amlalo's words, Mr. Hadeed is "a man of the people[,] especially for many immigrants who he has assisted genuinely and legally to become what they are in America today."

Indeed, Mr. Hadeed's children recall seeing the positive effects of their father's work for themselves. Son John writes:

> In the course of our daily lives we would run into his clients in the airport, the movie theater or the mall, and in every instance the interaction was the same: each and every one of them was moved and impacted at a personal level by the work my father had performed for them. These were not captains of industry or influential political figures – these were real people, whose lives he had changed, by helping them with their immigration issues, by helping them earn the opportunities he had.

*See* Ex. C.

### E.    The Need to Protect the Public from Further Crimes

Mr. Hadeed has no criminal record and no history of violence. He has lived in this area for his entire life and has made many tangible and positive contributions to this community and to the legal profession over the years. He continues to remain dedicated to this community. Despite this conviction, he has retained the support of his family, his peers, his clients, and others in this community. Under these circumstances, there is no rational likelihood that Mr. Hadeed will commit any offense, or in any way endanger the public.

### F.    The Sentence Requested by Mr. Hadeed

Taking all of the above into account, Mr. Hadeed respectfully requests that the Court impose a sentence of probation in this case. Should the Court decide to impose conditions on the

probation, Mr. Hadeed requests a term of community service and/or a term of home detention, so that he can work and earn income necessary to support his family.  In the current economic climate, it will be nearly impossible for Mr. Hadeed to find a new job, given the combination of record levels of unemployment and the stigma of a felony conviction.  Scott Sexauer, Mr. Hadeed's law partner, has extended Mr. Hadeed an offer of continued employment with the firm, as an office administrator.  (*See* Exhibit S, letter from Scott Sexauer.)  If the Court spares him incarceration, Mr. Hadeed will be able to use his reduced income as an office administrator, combined with his wife's expected income as a first-year associate lawyer, to pay the family's mortgage and their monthly bills.[7]

## III.    OTHER CONSIDERATIONS

Should the Court adopt the probation officer's calculation of the offense instead of the calculation Mr. Hadeed asserts is consistent with the jury's verdict (see Section II.C, *infra*), "Zone C" of the Guidelines will apply.  If he is sentenced under Zone C, and is not given a term of probation, Mr. Hadeed requests a split sentence of imprisonment and home detention, which the Guidelines expressly permit for Zone C sentences.  Guidelines § 5C1.1(d).

If the Court imposes a sentence of incarceration, Mr. Hadeed asks that the Court (i) permit him to self-surrender to the Bureau of Prisons and (ii) delay his reporting date to allow him time to put his family and business affairs in order.  Mr. Hadeed is the sole provider for his wife and for the three of his six children who still live at home.  Additionally, he has two children in college, both of whom are financially dependent on him for tuition and other living

---

[7]    Mr. Hadeed notes that Tony Tahan, the linchpin in the conspiracy alleged by the Government, received a sentence of community confinement when he was sentenced in 2004, so that he could continue to operate his Bakery while serving his sentence.  Mr. Hadeed submits that his work and family situations are more compelling, and justify home detention: in addition to a business with over a dozen employees who will be severely affected if he is incarcerated, Mr. Hadeed has a large family (namely, his wife and five of his children) that is financially dependent on him.

expenses.  As far as his professional life is concerned, Mr. Hadeed was the lead partner of his law firm, and has 16 employees who report directly to him and depend on him for employment. Mr. Hadeed will need time to make considerable preparations for his family and his employees before he reports to a detention facility.

Mr. Hadeed respectfully submits that these conditions of surrender are reasonable because he does not present any risk of flight, or any other risk to the community.  Mr. Hadeed was raised in this community from birth (and, indeed, his parents and siblings still live here); he attended law school here and has built his law practice solely in Northern Virginia; and he is currently raising his own large family here.  Moreover, Mr. Hadeed has absolutely no history of violence, and, in fact, has made tangible, positive contributions to this community for many years.

## CONCLUSION

For the reasons set forth above, and in accordance with due consideration of the factors set forth in 18 U.S.C. § 3553(a), Mr. Hadeed respectfully requests that the Court impose a period of probation as the just sentence in this case.

Dated: May 20, 2009

Respectfully submitted,

MICHAEL MITRY HADEED, JR.

By:    /s/_____
       Laurin H. Mills, Esq.
       *Pro Hac Vice*
       D. Grayson Yeargin, Esq.
       *Pro Hac Vice*
       Emily C. Harlan, Esq.
       VA Bar No. 76813
       Attorneys for MICHAEL MITRY HADEED, JR.
       NIXON PEABODY LLP

401 Ninth Street, N.W., Suite 900
Washington, D.C.  20004
(202) 585-8000
Fax (202) 585-8080
lmills@nixonpeabody.com
gyeargin@nixonpeabody.com
eharlan@nixonpeabody.com

William B. Cummings, Esq.
VA Bar No. 6469
Attorney for MICHAEL MITRY HADEED, JR.
WILLIAM B. CUMMINGS, P.C.
Post Office Box 1177
Alexandria, Virginia  22313
(703) 836-7997
Fax (703) 836-0238
wbcpclaw@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of May 2009, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to the following registered ECF users:

Anthony Asuncion, Esq.
United States Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530
anthony.asuncion@usdoj.gov

Scott B. Nussbum, Esq.
United States Attorney's Office for the Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia  22314
Scott.B.Nussbum@usdoj.gov

/s/_____
Laurin H. Mills, Esq.
*Pro Hac Vice*
D. Grayson Yeargin, Esq.
*Pro Hac Vice*
Emily C. Harlan, Esq.
VA Bar No. 76813
Attorneys for MICHAEL MITRY HADEED, JR.
NIXON PEABODY LLP
401 Ninth Street, N.W., Suite 900
Washington, D.C.  20004
(202) 585-8000
Fax (202) 585-8080
lmills@nixonpeabody.com
gyeargin@nixonpeabody.com
eharlan@nixonpeabody.com

William B. Cummings, Esq.
VA Bar No. 6469
Attorney for MICHAEL MITRY HADEED, JR.
WILLIAM B. CUMMINGS, P.C.
Post Office Box 1177
Alexandria, Virginia  22313
(703) 836-7997
Fax (703) 836-0238
wbcpclaw@aol.com