IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )       1:08cr461 (LMB)
                                    )
MICHAEL MITRY HADEED, JR.           )
                                    )
        Defendant.                  )
                                    )
                                    )

## MEMORANDUM OPINION

Before the Court is defendant Michael Mitry Hadeed, Jr.'s
Motion for a Judgment of Acquittal or, in the Alternative, New
Trial, pursuant to Fed. R. Crim. P. 29(c) and 33.  For the
reasons stated in open court and more fully explained in this
memorandum opinion, the defendant's motion has been denied.

### I. Background.

**A. The Charges.**

Michael Mitry Hadeed, Jr. was indicted on four counts:
conspiracy to commit immigration fraud and to defraud the United
States in violation of 18 U.S.C. § 371, aiding and abetting a
material false statement to a United States government agency in
violation of 18 U.S.C. §§ 1001 and 2, and two counts of aiding
and abetting immigration fraud in violation of 18 U.S.C. §§
1546(a) and 2.  He pled not guilty and was tried before a jury.
At the close of the government's case, the Court granted Hadeed's
motion under Fed. R. Crim. P. 29(a) to dismiss the latter two

counts for lack of evidence, leaving only the conspiracy and false statement counts. The jury convicted Hadeed of both remaining counts. He has now moved for a judgment of acquittal or, in the alternative, a new trial.

The conspiracy count alleged that Hadeed, an attorney specializing in immigration law, was a key player in an arrangement to profit by obtaining immigration documents for a number of aliens under fraudulent pretenses. According to the government, the King of Pita Bakery ("King of Pita"), owned by Tony Tahan, served as the aliens' "sponsor" in the immigration process by claiming that it would employ them as skilled bakers, and, at the advice of Hadeed and Tahan, the aliens obtained letters falsely stating that they had worked as bakers in their countries of origin. In addition to advising the aliens and Tahan, Hadeed, as the attorney for both the aliens and King of Pita, allegedly prepared the documents in question. The second count, aiding and abetting a material false statement, alleged that Hadeed assisted Charbel Freifer, one of the aliens, in falsely claiming on a State Department application for a skilled worker visa that he was a baker in his native Lebanon.

### B. The Labor Certification Process.

Witnesses for both the government and the defense described the process by which a foreign national who secures employment in the United States can obtain lawful permanent resident ("LPR")

-2-

status, colloquially known as a "green card." First, an employer with an open position - the sponsor - must attempt to recruit United States citizens or permanent residents for the position, such as by posting an advertisement. If the efforts to find an appropriately qualified worker prove unsuccessful, the employer, together with a prospective alien employee, may apply for a labor certification from the United States Department of Labor, using a Form ETA-750. In the ETA-750, the employer describes the nature of the open position and any required experience, and the alien describes his or her relevant education or job experience. If the alien claims to have a type of work experience, he or she attaches documentation, such as letters from former employers. If the Department of Labor approves the ETA-750,[1] the employer then files a Form I-140, an Immigrant Petition for Alien Worker, with the U.S. Citizenship and Immigration Services (USCIS),[2] in which the employer again lists the identity of the alien, the type of position, the experience required, and the alien's qualifications. If the I-140 is approved, the alien must follow one of two steps to obtain LPR status. If the alien lives abroad, he or she files a Form DS-230 visa application with the Department of State. If the alien is already living in the

---

[1]The ETA-750 is also reviewed by a state agency, which in Virginia is the Virginia Employment Commission.

[2]The USCIS was formerly known as the Immigration and Naturalization Service (INS).

-3-

United States, he or she files a Form I-485 with the USCIS.
Approval of either form results in LPR status.

### C. The Government's Case Against Hadeed.

The government presented as evidence several of the above
documents relevant to five specific aliens: Marouf Arbid, Ibrahim
Alakwa, Ana Pagoaga, Jean-Claude Sakr, and Charbel Freifer.
Specifically, the government's trial exhibits included Forms ETA-
750 and I-140 for all five aliens, a Form I-485 for Alakwa,
Pagoaga, and Sakr, and a Form DS-230 for Freifer, all of which
were prepared and signed by Hadeed.  Each document claimed that
the named alien would work as a baker at King of Pita, and had at
least four years of experience at a bakery or bakeries in his or
her home country.  The government also presented the experience
letters that had been attached to the ETA-750 and I-140 forms.
Each letter purported to be from a bakery at which the named
alien claimed to have worked.

Three of the aliens - Pagoaga, Sakr, and Freifer - testified
for the prosecution.  Each maintained that he or she had never
been a baker before working at King of Pita.  Rather, they
testified, Tahan and Hadeed encouraged them to claim the relevant
experience on their forms and to obtain these letters to ensure
that their applications would be approved.

Pagoaga testified that Hadeed's paralegal, Ana Araos, met
with undocumented immigrant workers at King of Pita and told them

-4-

that Hadeed's firm could help them get green cards if they
obtained experience letters claiming that they had been bakers in
their home countries.  Pagoaga stated that although she had never
held any job in her native Honduras, she obtained a letter
stating that she was a pastry baker.  However, according to
Pagoaga, when she initially presented the letter to Hadeed,
Hadeed threw it down on his desk, stating, "No good," because it
did not claim a sufficient number of years of experience and was
not adequately clear and convincing.  Pagoaga testified that she
eventually obtained a different letter that was acceptable to
Hadeed.  Both letters were admitted into evidence.  See Gov't Ex.
16A, 16B, 17A, 17B.

Sakr testified that he was introduced to Hadeed by a friend,
Bernard Chaaya, who had helped him enter the United States on a
false visa.  According to Sakr, he initially told Hadeed that he
was seeking political asylum, but Hadeed encouraged him instead
to obtain LPR status through the labor certification process by
working at King of Pita.  Sakr stated that he had been a
bartender in Lebanon and had brought to the United States
letters and certificates attesting to this experience; those
documents were introduced into evidence.  See Gov't Ex. 52, 53,
54.  However, according to Sakr, Hadeed told him that he would
not be able to obtain LPR status as a bartender, and that he
should instead get a letter claiming that he had been a baker.

-5-

That letter was introduced into evidence as well.  See Gov't Ex.
23.  In response to attempts by the defense to impeach Sakr using
his grand jury testimony, the government also introduced into
evidence, as a prior consistent statement, a contemporaneous
account Sakr wrote in 2002 stating that Hadeed had told him to
obtain paperwork from Lebanon claiming that he was a baker.  See
Gov't Ex. 57.

　　　Freifer testified that he initially came to the United
States on a student visa, but was unable to continue his
education after his cousin was no longer able to support him
financially.  He testified that his friend, Sakr, introduced him
to Tahan, who introduced him to Hadeed, and that Hadeed advised
him to pursue LPR status through the labor certification process.
Hadeed also told him that he needed a letter claiming experience
as a baker.  According to Freifer, he told Hadeed that he had no
such experience, but ultimately obtained a letter from a bakery
near his parents' home in Lebanon claiming that he had worked
there as a baker for over four years.  See Gov't Ex. 30A, 30B.

　　　Tony Tahan also testified for the prosecution.  He stated
that Hadeed began doing immigration work for King of Pita in 1996
or 1997 after handling assorted legal work for the company for
about a decade.  According to Tahan, Hadeed told him that King of
Pita could sponsor its employees' attempts to gain LPR status by
claiming to employ them as bakers, even though, according to

-6-

Tahan, both he and Hadeed knew that King of Pita was an "assembly line" operation that only employed one baker at a time, with most of its employees working as baggers or in quality control.  Tahan testified that the aliens working at King of Pita who sought LPR status would have amounts periodically deducted from their salaries, for a total of $10,000 per alien, to pay Hadeed's fees and the various fees associated with filing the immigration documents.  According to Tahan, Hadeed knew that the aliens did not have actual baking experience and that King of Pita was not employing them as bakers.  Tahan also testified regarding a classified advertisement for a baker position at King of Pita, a copy of which was admitted into evidence.  See Gov't Ex. 35B. The advertisement, which was placed by Hadeed on King of Pita's behalf, stated that applicants were required to have experience baking certain specific kinds of breads.  Tahan testified that King of Pita did not actually produce many of the breads listed, but that when he informed Hadeed, Hadeed told him that it was preferable to place an advertisement that would generate few, or no, responses so that King of Pita could claim that it needed to hire foreign workers.

Despite some inconsistencies, Tahan's testimony essentially corroborated the accounts of Pagoaga, Sakr, and Freifer regarding the circumstances under which they met Hadeed and became involved in the conspiracy.  Tahan also testified concerning the other two

-7-

aliens referenced in the indictment, Arbid and Alakwa.

Tahan testified that he met Arbid, a bartender in the Beirut airport, in 1999, and convinced him to come to the United States so that the two could pursue a romantic relationship.  When Tahan brought Arbid to Hadeed, Arbid, like Sakr, told Hadeed that he had worked as a bartender, but Hadeed responded that King of Pita could sponsor him if he obtained a letter claiming that he had been a baker for four years.  Tahan stated that Hadeed rejected the first letter that Arbid provided because it claimed only two years experience, did not state what his salary was, and was not on company letterhead or signed by a supervisor.  According to Tahan, Hadeed accepted a final draft of the letter that complied with these requirements; that final draft was admitted into evidence.[3]  See Gov't Ex. 5.

Tahan further testified that in 2000, Hadeed approached him to propose a sponsorship arrangement for Alakwa.  This arrangement, according to Tahan, would be different from the others in that Alakwa would not actually work at King of Pita. Tahan claimed that he was reluctant to agree but that Hadeed convinced him to do so as a means of paying off a debt of about $40,000 that King of Pita owed to Hadeed.  According to Tahan,

---

[3]Tahan testified that through his dealings with Hadeed, he eventually became familiar with these requirements, and in some cases, such as Sakr's, he reviewed draft letters himself and only provided the final versions to Hadeed.

Alakwa, at Hadeed's suggestion, received a nominal amount of training at King of Pita in case immigration authorities questioned him about his job at his interview.  Tahan further testified that in order to create an appearance of legitimacy, King of Pita briefly placed Alakwa on its payroll, but Alakwa simply cashed his payroll checks and returned the cash to King of Pita.  Tahan's testimony regarding Alakwa was corroborated in part by Mohammed Korayem, a production manager at King of Pita, who testified that although Tahan told him to train Alakwa regarding the baking process, Alakwa only made a few appearances at King of Pita over a few weeks and did not appear genuinely interested in learning the process.

Finally, the government presented the testimony of Vikki Ravinskas, a bookkeeper at the law firm at which Hadeed was a partner.  She testified to several comments that Hadeed allegedly made in which he appeared to manifest knowledge of the conspiracy and a consciousness of guilt.[4]

### D. The Defense's Case.

The defense, in its cross-examination of the government's witnesses and its examination of its own witnesses, did not dispute that the aliens and Tahan committed immigration fraud, or that Hadeed was their attorney.  Rather, the defense argued that

---

[4]Ravinskas' testimony is discussed in greater detail _infra_ in the "Discussion" section.

-9-

Hadeed was unaware of the fraud, and that he reasonably relied on the conspirators' representations that all of the aliens were legitimately qualified, experienced applicants for bona fide positions as bakers at King of Pita.

The defense attacked the credibility of the government's witnesses, arguing that they were testifying against Hadeed in order to obtain favorable treatment from prosecutors or immigration authorities.  Defense counsel argued to the jury that the government's main witnesses – Tahan, Pagoaga, Sakr, and Freifer - were admitted perjurers, having lied on the various immigration forms, all of which they signed under penalty of perjury, and that Pagoaga and Freifer had only recently admitted to having falsified their work experience letters.  The defense particularly questioned the credibility of Tahan, who had entered into a plea agreement that enabled him to avoid any prison time, but was incarcerated as a result of a supervised release violation and faced the possibility of additional incarceration. The defense also focused on Tahan's testimony regarding Alakwa, stressing that King of Pita's records did not show, as Tahan claimed, that King of Pita owed Hadeed $40,000 in 2000.  In addition, the defense elicited testimony from Tahan, Sakr, and a Fairfax County detective, Douglas Comfort, that Tahan was involved in abusive sexual relationships with Arbid and Sakr, physically abused Sakr, withheld money from his paycheck,

-10-

threatened to rescind Sakr's sponsorship and have him deported, and accused him of crimes including larceny, drug use, and rape, but chose not to press charges, and that as a result, was barred from filing any future criminal complaints in Fairfax County without the approval of the Commonwealth Attorney's Office.  The defense pointed out that because Pagoaga, Sakr, and Freifer admitted that they did not speak English during the relevant time periods, all three communicated with Hadeed through interpreters - Sakr and Freifer through Tahan, Pagoaga through Araos - and therefore could not testify directly to anything Hadeed said, but only to what Tahan or Araos told them he said.

The defense also presented evidence that the witnesses who implicated Hadeed at trial had not mentioned his role in the conspiracy in several prior statements.  For example, Hadeed's name was not mentioned in either of the statement of fact sections of the plea agreements signed by Tahan and Sakr in 2004, and in Sakr's grand jury testimony in 2004, he denied Hadeed's involvement.  In addition, Comfort, in an affidavit prepared as part of his investigation of Tahan, Sakr, and Arbid, did not mention Hadeed or his law firm, nor did Tahan implicate Hadeed in a 2003 conversation with Comfort that was taped without his knowledge.  The defense also showed that as late as 2006, well after Hadeed was no longer representing King of Pita or any of the aliens, Freifer was still seeking to enter the United States

-11-

by claiming to have experience as a baker and seeking employment
at King of Pita, but was using the services of a different
attorney.

In addition to attacking the credibility of the government's
witnesses, the defense also argued that Hadeed lacked a motive to
participate in the alleged conspiracy.  According to the
government, the motive was primarily financial; Hadeed and Tahan
required each immigrant to pay a total of $10,000, most of which
was paid through deductions from their King of Pita paychecks.
The defense, however, elicited testimony that King of Pita
frequently was delinquent in paying its bills, and that when
Hadeed withdrew from representing Tahan and King of Pita in 2004
after Tahan was arrested, Hadeed was forced to write off tens of
thousands of dollars in fees.  It also presented testimony by
Mark Mancini, an expert in immigration law, who testified that
from May 2001 through April 2004, due to an anomalous set of
circumstances, it was no harder, and it took no more time, to
obtain a skilled worker visa than an unskilled worker visa in the
Northern Virginia area.  According to the defense, Mancini's
testimony showed that Hadeed had no rational motive to encourage
the aliens to take the more difficult, costly, and legally risky
path of obtaining skilled worker visas.[5]

---

[5]This aspect of Mancini's testimony is discussed extensively
_infra_ in the "Discussion" section.

-12-

Finally, the defense argued that Hadeed relied on representations of Tahan and the aliens that appeared to be truthful. Mancini testified that there was nothing on the face of the final drafts of the experience letters that suggested that they were fraudulent. Citing testimony that the turnover rate at King of Pita was very high because Tahan was a difficult boss, the defense also argued there was no reason for Hadeed to have suspected fraud based on the large number of labor certifications King of Pita was submitting for bakers. Finally, the defense noted that part of the period in question - early 2001 - coincided with the expiration of a statutory window under the Legal Immigration Family Equity Act ("LIFE Act"), which allowed certain aliens residing in the United States to obtain green cards, notwithstanding their illegal status, after payment of a penalty. The defense argued that to the extent that King of Pita sponsored an unusual number of immigration petitions during that time period, it was reasonable for Hadeed to have attributed this to the expiration of the LIFE Act window.

## II. Standards of Review.

In evaluating a post-trial motion for acquittal, a court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319

-13-

(1979).  The Court does not weigh the evidence or review the credibility of witnesses, <u>United States v. Wilson</u>, 118 F.3d 228, 234 (4th Cir. 1997), and it examines the evidence in a cumulative context, not in a piecemeal fashion, <u>United States v. Burgos</u>, 94 F.3d 849, 863 (4th Cir. 1996) (<u>en banc</u>).

The standard for granting a motion for a new trial is more favorable to the defendant.  A court may grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  If the motion is based on the sufficiency of evidence, the court need not view the evidence in the light most favorable to the government.  <u>United States v. Arrington</u>, 757 F.2d 1484, 1484 (4th Cir. 1985).  It may evaluate the credibility of witnesses, and should grant the motion if the evidence "weighs so heavily against the verdict that it would be unjust to enter judgment."  <u>Id.</u>  That said, a court's discretion to grant a motion for a new trial should be exercised sparingly.  <u>Id.</u> at 1486.

### III. Discussion.

#### A. Testimony of Vikki Ravinskas.

Hadeed first argues that the jury's guilty verdict was "irreparably tainted" by certain testimony of Vikki Ravinskas, a bookkeeper at Hadeed's former law firm, who testified to three statements Hadeed made to her.  First, she testified that on June 11, 2007, she received a phone call from Araos, Hadeed's paralegal, who told her that she had been arrested.  According to

-14-

Ravinskas, when she informed Hadeed, Hadeed stated, "It should have been me that they were coming for.  It should have been me, not Ana."  Ravinskas further testified that on July 11, 2007, she met with an investigator from Araos' attorney's office, and learned from that conversation that Tahan had become a government informant.  She testified that after she relayed this information to Hadeed, Hadeed said, "They're coming for me next.  I should have known.  I shouldn't have been in this.  They're coming for me next."  Finally, Ravinskas testified that on December 17, 2008, about a month after Hadeed was indicted, Ravinskas saw Hadeed at the office, and he stated to her that he and his family were making preparations for his wife to take over his position in the firm "in the event that the worst happens."

The defendant contends that Ravinskas' testimony regarding the first statement - the one Hadeed allegedly made after Araos' arrest - was inadmissible under Fed. R. Evid. 404(b), confused the jury, and was unfairly prejudicial, warranting either an acquittal or a new trial.  See United States v. Hernandez, 975 F.2d 1035, 1041-42 (4th Cir. 1992) (vacating a conviction because of improperly admitted 404(b) evidence).  The defendant points out that, as discussed in written pretrial motions (Def.'s Resp. to Gov't Notice, Dkt. No. 94, at 9), pretrial oral argument (Mot. Hr'g Tr., Feb. 6, 2009, at 23-28), and at trial out of the jury's presence (Trial Tr. Vol. II at 253-65), Araos was arrested in

-15-

connection with a different immigration fraud conspiracy involving Pillar Construction Company, which also employed Hadeed's firm. The charges against Araos were eventually dropped, Hadeed himself was never charged, and there was evidence that the key conspirator in the Pillar case, Mamoun "Max" Najib, may have sought to keep Hadeed unaware of any wrongdoing. The government initially sought to introduce 404(b) evidence concerning the Pillar case, and the Court ruled such evidence inadmissable. The Court did, however, admit Ravinskas' testimony regarding Hadeed's statements after Araos' arrest, as well as her other two statements. (Id. at 263-64.) In so doing, the Court noted that the testimony was evidence of similar conduct - immigration fraud involving Hadeed's law firm - and that the evidence at trial implicated Araos in the King of Pita conspiracy as well. (Id. at 257, 263-64.) The Court also found that Ravinskas' testimony was probative of Hadeed's knowledge and intent, and was therefore proper to counter the defense's argument that Hadeed had no knowledge of the conspiracy at issue. (Id. at 255-56.)

The decision to admit Ravinskas' testimony regarding Hadeed's reaction to Araos' arrest does not warrant disturbing the jury's verdict. Even if the jury misunderstood this testimony to have suggested that Araos' arrest related to the King of Pita case, such a misunderstanding was not prejudicial.

-16-

The greatest possible prejudice that could have resulted from
Ravinskas' testimony is that the jury could have concluded that
Araos' arrest, and Hadeed's reaction, were both directly
connected to the King of Pita case, and therefore that Hadeed's
reaction was evidence of his knowledge and intent in that case.
However, any prejudice resulting from such a conclusion was
rendered irrelevant by Ravinskas' testimony that Hadeed reacted
in a virtually identical manner after being informed that Tahan,
the key co-conspirator in the King of Pita case, was cooperating
with the government.  Hadeed's reactions to the two events were
essentially the same;[6] accordingly, so were any inferences the
jury could have drawn regarding Hadeed's knowledge and intent.
Thus, even if the jury concluded that Hadeed's reaction following
Araos' arrest pertained to the King of Pita case, such evidence
was cumulative in light of Ravinskas' testimony regarding his
reaction upon learning of Tahan's cooperation.[7]  Any error in
admitting the testimony regarding Hadeed's reaction to Araos'
arrest was therefore harmless, and does not warrant acquittal or

---

[6]Indeed, Ravinskas testified to the similarity of the
reactions, stating that when informed of Tahan's cooperation,
Hadeed "was as frantic as he was the day that Ana had been
arrested."  (Trial Tr. Vol. III at 94.)

[7]Notably, it was Hadeed's reaction to Tahan's cooperation -
not his reaction to Araos' arrest - to which the government
referred explicitly in its closing argument, arguing that "at
that very moment in time . . . the defendant understood that
everything he'd been up to was now known by law enforcement."
(Trial Tr. Vol. IV at 13.)

a new trial.  See United States v. Cassidy, 48 Fed. Appx. 428,
440-41 (4th Cir. 2002) (holding that the erroneous admission of
cumulative evidence is not prejudicial).

### B. Irrational conspiracy.

Hadeed next argues that he should be acquitted because the
alleged conspiracy was "irrational."  The defendant cites the
expert testimony of Mancini, who, as explained supra, testified
that during the May 2001 through April 2004 time period, it was
no more difficult and took no more time for an alien seeking to
work in Northern Virginia to obtain a skilled worker visa than an
unskilled worker visa.  Mancini also confirmed that Hadeed's
billing practice of charging a flat rate for services, and his
rate, were reasonable billing practices.  On the basis of
Mancini's testimony, Hadeed argues that it would have been
irrational for him to engage in a conspiracy to secure skilled
worker visas, for which work experience letters were required,
rather than unskilled worker visas, for which no such letters
were required, because such a conspiracy would have required him
to do more work, for the same pay, at a greater risk, with no
discernible economic benefit.  Relying on Matsushita Elec. Indus.
Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), Hadeed argues
that because the government has offered no plausible motive for
him to have engaged in the conspiracy alleged in the indictment,
he should be acquitted or a new trial should be granted.  In

-18-

Matsushita, the Supreme Court, considering whether summary
judgment should have been granted in a civil action, observed:

> [T]he absence of any plausible motive to engage in the
> conduct charged is highly relevant to whether a
> "genuine issue for trial" exists within the meaning of
> Rule 56(e). Lack of motive bears on the range of
> permissible conclusions that might be drawn from
> ambiguous evidence: if petitioners had no rational
> economic motive to conspire, and if their conduct is
> consistent with other, equally plausible explanations,
> the conduct does not give rise to an inference of
> conspiracy.

Matsushita, 475 U.S. at 596-97.

Assuming that the above rationale from a civil action can be
applied to a Fed. R. Crim. P. 29(c) motion for acquittal or a
Fed. R. Crim. P. 33(a) motion for a new trial, Matsushita is
nonetheless distinguishable from the case at bar. The Court in
Matsushita did not hold that the lack of a plausible motive, by
itself, is sufficient grounds on which to grant summary judgment;
rather, it simply held that motive is relevant to a court's
analysis. Importantly, it also found that there was virtually no
"direct evidence" that the defendants in that case had engaged in
the alleged conspiracy. Id. at 595-96. The lack of direct
evidence, combined with the lack of a plausible motive, warranted
summary judgment. Id. at 595.

Here, unlike in Matsushita, the prosecution provided
considerable direct evidence, including witness testimony and
documents, that directly implicated Hadeed in the conspiracy.
The evidence was not merely circumstantial and was clearly

-19-

sufficient to support a conviction.  Moreover, the jury heard no evidence that Hadeed himself was aware of the unusual status of the labor market between 2001 and 2004 that allegedly made it no harder to obtain a skilled worker visa than an unskilled worker visa.  It merely heard Mancini's opinion that an immigration attorney would have been aware of the situation.[8]  In the absence of any evidence as to Hadeed's own knowledge of the circumstances that supposedly made his conspiracy "irrational," a reasonable jury could have concluded that Hadeed encouraged aliens to apply for skilled worker visas because he believed it was a reliable way for them to gain LPR status, and that he was motivated by the very rational prospect of financial gain.  In addition, given the direct evidence against Hadeed, the jury was not required to conclude that the King of Pita conspiracy was the most efficient, profitable, or rational scheme possible.  A rational trier of fact could have convicted Hadeed notwithstanding Mancini's testimony.  Moreover, his testimony, considered together with the other evidence, does not weigh so heavily against the verdict that it would be unjust to enter judgment.

### C. Materiality of False Statement.

Count 2 alleges that Hadeed aided and abetted the material false statement of Freifer, who falsely stated on his Form DS-

---

[8]It is also noteworthy that, according to the testimony of Tahan and others, the conspiracy began well before 2001, the time period to which Mancini testified.

230, which was submitted to the State Department, that he had been a baker in Lebanon. Hadeed argues that Freifer's statement, even if false, was not material as a matter of law.

A false statement to a government agency is material if it would have a "natural tendency to influence the decisions of" the agency. Kungys v. United States, 485 U.S. 759, 772 (1988). In determining materiality, the key consideration is "what would have ensued from official knowledge of the misrepresented fact . . . not what would have ensued from official knowledge of inconsistency between a posited assertion of truth and an earlier assertion of falsehood." Id. at 775. The materiality of Freifer's false statement therefore depends on whether, had the State Department known that Freifer was not a baker in Lebanon, such knowledge would have had a natural tendency to influence its disposition of the visa application he submitted to the agency.

As the defendant concedes, see Def.'s Mem. 16, the prosecution clearly put forth sufficient evidence to show that Freifer's false statement was material to his ability to obtain a skilled worker visa. Cathleen Carothers, a State Department employee, testified that because a skilled worker is "coming to the United States to perform a specific profession," the State Department "would rely very heavily on that employment section to see that they've had the necessary work experience." (Trial Tr. Vol. II at 241.) According to Carothers, "if fraud was found,

-21-

then - and it, and it qualified for an ineligibility, then the consular officer would find the applicant ineligible for the visa and would typically return the petition to DHS with a recommendation of revocation." (Id. at 242.) Carothers' unrebutted testimony is sufficient to support the jury's finding that Freifer's false statement had a natural tendency to influence the State Department's decision to grant him a skilled worker visa.[9]

Hadeed argues, however, that to sustain a guilty verdict for making a materially false statement on an immigration document, the prosecution must provide sufficient evidence from which a jury could conclude that the misrepresentation had a natural tendency to influence the alien's ability to obtain a visa, or to enter the United States, at all. The defense argues that in light of the unique circumstances outlined in Mancini's testimony, Freifer could have obtained an unskilled worker visa had he applied for one, and that his false statement therefore was not material.

It is true that an exacting standard applies to the

---

[9]The defendant, seizing on Carothers' qualifier "and it qualified for an ineligibility," argues that Freifer's fraud pertaining to his work experience would not have automatically disqualified from obtaining a visa. However, Carothers clearly testified that Freifer's false statement was critical to the State Department's evaluation of his application for a skilled worker visa, which is sufficient to meet the Kungys standard of a statement having a "natural tendency to influence" the agency's decision.

materiality of a false statement in immigration cases. <u>See</u> <u>Chaunt v. United States</u>, 364 U.S. 350, 355 (1960) (holding that, in a denaturalization proceeding, to prove that citizenship was procured by "concealment of a material fact or by willful misrepresentation," the government must show "either (1) that facts were suppressed which, if known, would have warranted denial of citizenship or (2) that their disclosure might have been useful in an investigation possibly leading to the discovery of other facts warranting denial of citizenship"); <u>United States</u> <u>v. Naserkhaki</u>, 722 F. Supp. 242, 245 (E.D. Va. 1989) (holding that an alien's false statement that he had not previously filed a certain document was not material because the government had not met its burden to show that the false statements would have been "germane to the examiner's consideration of the present . . . application under the criteria set out in the regulations"). Freifer's false statement, however, meets this standard, because he applied for a type of visa that required him to have relevant work experience. As Carothers testified, the lack of such experience would have been highly relevant to the State Department's decision whether to grant him that visa. Accordingly, his statement was material.

### D. Multiple Conspiracies.

Finally, Hadeed contends that his conviction for conspiracy should be set aside or a new trial granted because the evidence

-23-

at trial proved multiple conspiracies rather than the single conspiracy alleged in the indictment, and because the Court failed to instruct the jury with the defendant's multiple conspiracy instruction.

If there is a material variance between the charge in an indictment and the facts proven at trial, reversal is required only if the variance causes actual prejudice, <u>United States v. Kennedy</u>, 32 F. 3d 876, 883 (4th Cir. 1994), meaning an outcome at trial that is "unreliable or fundamentally unfair," <u>United States v. Leon</u>, 33 Fed. Appx. 690, 691 (4th Cir. 2002). To show prejudice from a multiple conspiracy variance, a defendant must prove "that there are so many defendants and so many separate conspiracies before the jury that the jury was likely to transfer evidence from one conspiracy to a defendant involved in an unrelated conspiracy." <u>Kennedy</u>, 32 F.3d at 883 (internal quotation marks omitted).

The indictment against Hadeed alleged a single conspiracy, although it did not identify co-conspirators by name. In its response to Hadeed's Motion for a Bill of Particulars (Dkt. No. 53), the government clarified the conspiracy allegation by identifying, either explicitly or implicitly, Tahan, Araos, Arbid, Alakwa, Sakr, Pagoaga, and Freifer as co-conspirators.[10]

_____

[10]Tahan, Sakr, and Araos were explicitly described as co-conspirators in the response to the Motion for a Bill of Particulars. (<u>See</u> Gov't Resp. Mot. Bill Particulars at 2.) In

-24-

In addition, in its response to Hadeed's pretrial Motion to Dismiss, the government argued, as it does now, that "the essence of the conspiracy was an agreement between defendant and Tony Tahan to establish a systematic method to use the King of Pita Bakery . . . as a vehicle by which to evade the immigration laws of the United States . . ." (Gov't Resp. Mot. Dismiss, Dkt. No. 60, at 13.)  As supplemented by the government's responses to pretrial motions, the indictment clearly alleged a single conspiracy with Hadeed and Tahan as the key members.

The evidence at trial fully supported a finding of a single conspiracy involving Hadeed and Tahan.  A single conspiracy "generally is demonstrated by an overlap of key actors, methods, and goals."  Dickson v. Microsoft Corp., 309 F.3d 193, 203 n. 12 (4th Cir. 2002) (internal citations omitted).  The evidence showed that throughout the time period alleged, common actors - Hadeed, Tahan, and often Araos - employed a common method - encouraging and assisting aliens to apply for LPR status by falsely claiming that they had been bakers in their home countries and would work as skilled bakers at King of Pita - in furtherance of common goals - making a profit and (possibly) obtaining LPR status for the aliens.

---

addition, the government stated that it had "identified by name in the Indictment five separate alien co-conspirators."  (Id. at 10.)  As the only aliens mentioned by name in the indictment were Arbid, Alakwa, Sakr, Pagoaga, and Freifer, the government necessarily described them as co-conspirators.

Despite the interconnections of the core conspirators, the defense argues that the evidence at trial showed only a "rimless wheel" - one in which the "spokes" of an alleged conspiracy are not connected by a shared purpose or plan - and therefore proved not one conspiracy but many. See United States v. Kotteakos, 328 U.S. 750, 755 (1946); Dickson, 309 F.3d at 203. One conspiracy requires "interdependence among the alleged co-conspirators," United States v. Chandler, 388 F.3d 796, 811 (11th Cir. 2004), and the co-conspirators must share some common goal beyond breaking the same law, United States v. Goss, 329 F.2d 180, 183 (4th Cir. 1964). The defense asserts that the evidence at trial showed that Arbid, Alakwa, Sakr, Pagoaga, and Freifer were not co-conspirators as alleged in the indictment because they did not share a common goal; rather, each alien was focused on gaining legal status for himself or herself. The defense further argues that the issue of whether the aliens were co-conspirators in the charged conspiracy amounted to a material variance that was prejudicial to Hadeed because, by alleging only one conspiracy, the prosecution was able to present evidence of conduct from separate conspiracies that would otherwise have been time-barred.[11]

---

[11]To convict a defendant of a conspiracy under 18 U.S.C. § 371, the government must prove at least one overt act in furtherance of the conspiracy within the time limit set by the statute of limitations. United States v. Head, 641 F.2d 174, 177 (4th Cir. 1981). In the case at bar, many of the overt acts

-26-

The defense's argument is unavailing because Hadeed has
"failed to show that [he] suffered any prejudicial effect from
the alleged variance." Kennedy, 32 F. 3d at 883.  The
government's evidence established beyond a reasonable doubt that
a single conspiracy between Hadeed and Tahan continued throughout
the entire period alleged in the indictment, and that at least
one overt act in furtherance of that conspiracy occurred within
the time limit set by the statute of limitations.  Whether the
aliens themselves had the status of co-conspirators in that
conspiracy is irrelevant, because all of the evidence at trial
was admissible as proof of the ongoing conspiracy between Hadeed
and Tahan.  There was evidence that all of the aliens - some of
whom, such as Sakr and Freifer, knew each other - dealt with
Hadeed and Tahan, and at their advice, claimed on various
immigration forms to be seeking jobs as bakers at King of Pita
and to have past baking experience.  Had the indictment named
only Hadeed and Tahan as co-conspirators, all of the evidence
presented at trial would still have been admissible against

---

alleged in the indictment occurred before the limitations period,
which began on November 18, 2003.  Accordingly, the Court
instructed the jury that it had to conclude beyond a reasonable
doubt that at least one overt act alleged in the indictment
occurred after November 18, 2003.  See id. (holding that such an
instruction was warranted when it was requested three times by
the defendant and where the indictment "rested in large part on
acts occurring without the limitations period").  The jury
indicated in the Special Verdict Form that it found three such
overt acts, those alleged in paragraphs 58, 61, and 62 of the
indictment.

-27-

Hadeed.   Accordingly, even if the evidence at trial did not establish that each alien was a co-conspirator in the charged conspiracy, Hadeed suffered no prejudice.

On this record, there was no basis to give a multiple conspiracy instruction, which is only required if "the proof at trial demonstrates that [the defendant was] involved <u>only</u> in separate conspiracies <u>unrelated</u> to the overall conspiracy charged in the indictment." <u>Id.</u> at 884 (first emphasis added, second emphasis in original, internal quotation marks omitted).   For the reasons discussed above, the evidence at trial showed that Hadeed was involved in one conspiracy, not many, and a multiple conspiracy instruction was therefore not required.   <u>See id.</u>, citing <u>United States v. Mills</u>, 995 F.2d 480, 485 (4th Cir.1993) ("A court need only instruct on multiple conspiracies if such an instruction is supported by the facts.").

### IV. Conclusion.

For the reasons stated in open court and in this memorandum opinion, Hadeed's Motion for a Judgment of Acquittal or, in the Alternative, New Trial has been denied.

Entered this _12_ <sup>th</sup> day of June, 2009.


Alexandria, Virginia

                                        /s/ _____
                                        Leonie M. Brinkema
                                        United States District Judge